Your Name: David S. Gross

Address: 1800 Poplar Dr., Apt #10, Medford, OR, 97504

Phone Number: (951) 240-1620

E-mail Address:  davidgross18@gmail.com

Pro Se Plaintiff

> _Filed __Received __Entered __Served On
> Counsel/Parties of Record
>
> **JUN 2 6 2024**
>
> Clerk US District Court
> District of Nevada
>
> By:_____ Deputy

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

DAVID S. GROSS,

            Plaintiff,

  v.

CHEMBIO DIAGNOSTICS, INC.,
KATHERINE L. DAVIS, JOHN G.
POTTHOFF, DAVID W.K.
ACHESON, DAVID W. BESPALKO,
RICHARD L. EBERLY, LESLIE
TESO-LICHTMAN, and LAWRENCE
J. STEENVOORDEN.

            Defendants.

Case No. 3:23-cv-00093-MMD-CSD

**COMPLAINT FOR VIOLATIONS
OF SECTIONS 14(d), 14(e), 20(a)
and REGULATION M-A OF THE
SECURITIES EXCHANGE ACT
OF 1934**

**<u>JURY TRIAL DEMAND</u>**

## <u>AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>

1      Plaintiff David S. Gross ("Plaintiff"), alleges as follows based (i) upon personal knowledge

2  with respect to himself and his own acts, and (ii) upon information and belief as to all other

3  matters based on the investigation conducted by himself, which included, among other things, a

4  review of the relevant U.S. Securities and Exchange Commission ("SEC") filings, earnings

1   conference calls, and other publicly available information. **NOTE: Due to the extensive**

2   **revisions made to the original Complaint, strike-through and bold formatting is**

3   **impractical. This Amended Complaint supersedes the original in its entirety and should be**

4   **considered the sole and controlling pleading.**


## NATURE OF THE ACTION

5   1.   The action is brought by Plaintiff against Chembio Diagnostics, Inc. ("Chembio" or

6   "the Company") and the members of the Company's board of directors ("Board") for violations of

7   (i) Sections 14(d), 14(e), 20(a), and Regulation M-A (17 CFR § 229.1011(c)) of the Securities

8   Exchange Act of 1934 ("Exchange Act") codified in 15 U.S.C. § 78n(d), § 78n(e), § 78t(a), and §

9   78t(c). Plaintiff's claims arise in connection with the Board's recommendation that the

10   stockholders of the Company ("Chembio Stockholders") tender their shares to an affiliate of

11   Biosynex SA, ("Biosynex"), pursuant to a tender offer ("Tender Offer") to acquire all of the issued

12   and outstanding shares of Chembio for $0.45 in cash per share (such that Chembio's market

13   capitalization was $17.2 million) ("Merger Consideration") after a Board sponsored and

14   recommended a fairness analysis of the Tender Offer that deemed it reasonable ("The Craig-

15   Hallum Fairness Opinion", described in this Complaint under "Background to the Merger with

16   Biosynex"). Plaintiff pleads and elaborates further in the "Substantive Allegations" section herein

17   that the Craig-Hallum Fairness Opinion and Tender Offer had (i) a significant conflict of interest

18   due to (i)(a) past investment banking services Craig-Hallum had with Chembio to the tune of a

19   $60 million dilutive "shelf" stock offering, and (i)(b) having clauses that Craig-Hallum or their

20   affiliates may actively trade securities of Chembio, including short positions, (ii) omitted material

21   financial data and financial projections broken down by product/product segment and

1    region/subsidiary for key Chembio products and partnerships and rather just lumped all revenue

2    into one category, thus misleading investors, (iii) omitted material information about what was and

3    was not known from a regulatory and grant monies perspective including detailed regulatory

4    timelines and description of latent issues for key Chembio products and partnerships, such as not

5    listing Chembio's applicable Food & Drug Administration (FDA) CBER (Center for Biologics

6    Evaluation and Research) product titles, numbers, or application files as well as relevant FDA

7    CBER custodians / e-mail inboxes that worked with Chembio, (iv) omitted to state that many

8    aggregate Chembio shares "failed to deliver" as per online Securities & Exchange Commission

9    (SEC) records, potentially having a material effect on public market comparisons made in the

10   Tender Offer and (v) was misleading by comparing Chembio to dissimilar companies, rather than

11   a fundamental financial analysis for Chembio exclusively, since each and every company in the

12   biologics domain must go through their own FDA regulatory approvals and, in Chembio's case,

13   Centers for Disease Control (CDC) grants, and has their own patents, patents pending, and

14   intellectual property. If Defendants (i) employed a neutral party to draft the Fairness Opinion that

15   had no prior relationship to Chembio, (ii) included all the material financial information regarding

16   Chembio's key products and partnerships broken down by product/product segment and

17   region/subsidiary (iii) included all material information about FDA CBER points of contacts,

18   custodian e-mail inboxes, and product/application reference numbers to validate their product

19   development timelines and scientific claims with the FDA and CDC (iv) mentioned, explained, or

20   definitively said an explanation escaped Chembio and the Board as to why many aggregate

21   Chembio failed to deliver, as cataloged by the SEC, during the relevant time period that, and (v)

22   did not agree, expressed no opinion, or stated to not take an opinion to a Fairness Opinion which

23   compared Chembio against other knowingly dissimilar companies, and instead chose to only

1    approve an analysis that stuck to financial fundamentals and regulatory certainties, this would have

2    (vi) resulted in a higher level of bidder interest in Chembio and a potentially higher valuation for

3    Chembio, more so $0.45 per share.

4        2.    On January 31, 2023, Chembio and Biosynex announced that they had entered into an

5    agreement ("Merger Agreement") providing for Biosynex to purchase all of the outstanding shares

6    of Chembio for the Merger Consideration via the Tender Offer.                            .

7        3.    On February 14, 2023, Biosynex commenced the Tender Offer by filing a Tender Offer

8    Statement TO ("TO Statement") with the SEC. The TO Statement provides that the Tender Offer

9    expires one minute after 11:59 P.M. Eastern Time on March 14, 2023 ("Expiration Date"), unless

10   extended or earlier terminated in accordance with the Merger Agreement. Upon satisfaction of

11   various conditions described in the TO Statement, and consummation of the Tender Offer,

12   Chembio will survive as a wholly-owned subsidiary of Biosynex under Nevada law pursuant to a

13   series of merger transactions ("Merger").

14       4.    On February 14, 2023 Defendants filed a materially misleading Schedule 14D-9

15   Solicitation/Recommendation Statement ("Recommendation Statement") with the SEC

16   recommending that Chembio Stockholders tender their shares to Biosynex pursuant to the Tender

17   Offer. As detailed in the "Substantive Claims" section herein, the material misrepresentations and

18   omissions in the Recommendation Statement render it false and misleading in violation of the

19   above-referenced Exchange Act provisions.

20       5.    Plaintiff points out that the Tender Offer vote only passed by a 51% margin of Chembio

21   Stockholders and only after having to redo the voting three total times, the first two attempts to

22   pass the Tender Offer failed to achieve 51%, and the voting rounds took over a month. Plaintiff

23   pleads that it is not honest for a public stock subject to a tender offer to have multiple voting rounds

1    to reach the 51% threshold. Tender offers are designed to be a one-time opportunity for

2    shareholders to decide whether to sell their shares at the proposed price. The core principle of a

3    tender offer is that shareholders have a single opportunity to decide if the offer is attractive enough

4    to sell their shares. Re-voting could be seen as pressuring shareholders who didn't initially sell.

5    Tender offers are often time-sensitive, as the bidder might be competing with other potential

6    buyers or market fluctuations. Multiple voting rounds could extend the process and create

7    uncertainty.   Securities regulations aim to ensure fairness and transparency in acquisitions.

8    Multiple voting rounds could raise concerns about manipulation or coercion. Although Chembio

9    and the Board may claim that there wasn't a true "second and third round" of voting, due to the

10   minimum conditions of reaching a specific percentage of tendered shares (51%) set forth in the

11   Tender Offer, the bidder Biosynex never raised the offer price or terms after the first two rounds

12   of voting failed to achieve 51%, with the first round being only 38.5% of the then-outstanding

13   Shares.

14         6.    As the Tender Offer is now closed and the Merger is consummated, and the Court

15   considers any "extraordinary remedy" to undo the Merger consummation "moot" (Court Order

16   Dated 06/05/2024) Plaintiff reserves the right to recover damages suffered by himself as a result

17   of such violations., as listed in the "Prayer for Relief" section herein. Plaintiff's original Complaint

18   pre-dates triggering of any part of the "cashing out" process for his shares involved in the right-to-

19   receive stipulations of the Tender Offer. Plaintiff's Complaint is mentioned by Chembio on

20   03/15/2023 in the Tender Offer's Amendment No. 3 "SCHEDULE 14D-9/A Amendment No. 3"

21   viewable        on        the        SEC's        EDGAR        website        at

22   https://www.sec.gov/Archives/edgar/data/1092662/000114036123011731/brhc10049737_sc14d9

1     a.htm or mirrored at https://archive.is/FJ23h: that was signed by Chembio's President Larry

2     Abensur, the relevant portion below:

3          "On March 8, 2023, a pro se complaint was filed in the United States District Court, District

4     of Nevada, against the Company and the individual members of the Company Board and

5     management, captioned David S. Gross v. Chembio Diagnostics, Inc., Katherine L. Davis, John

6     G. Potthoff, David W.K. Acheson, David W. Bespalko, Richard L. Eberly, Leslie Teso-Lichtman,

7     and Lawrence J. Steenvoorden, Case No. 3:23-cv-00093 (the "*Nevada Complaint*, and together

8     with the New York Complaint, the "*Complaints*")."

9     Plaintiff voted against the Tender Offer with all his shares during each of the rounds of voting.

10    The Tender Offer expired on 04/26/2023, as the 51% threshold was met, after the third voting

11    round.

12        7. For reference, the relevant "Solicitation/Recommendation Statement Under Section

13    14(d)(4) of the Securities Exchange Act of 1934" is viewable here:

14    https://www.sec.gov/Archives/edgar/data/1092662/000114036123006991/ny20007154x3_sc14d

15    9.htm or at the following mirror: https://archive.is/3Uuby. The "relevant time period" is when

16    Plaintiff was a Chembio Stockholder which was between 05/25/2021 until he was cashed out by

17    the Tender Offer on 05/12/2023.

## JURISDICTION AND VENUE

18        8.    This Court has subject matter jurisdiction over the claims asserted herein for

19    violations of Sections 14(d), 14(e) and 20(a) of the Exchange Act pursuant to Section 27 of the

1    Exchange Act, 15 U.S.C. § 78aa, § 78n(d), § 78n(e), § 78t(a), § 78t(c), and 28 U.S.C. § 1331

2    (federal question jurisdiction).

3        9.    This Court has personal jurisdiction over each of the Defendants because each

4    defendant has sufficient minimum contacts with the United States so as to make the exercise of

5    jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

6    *See Moon Joo Yu v. Premiere Power LLC*, No. 14 CIV. 7588 KPF, 2015 WL 4629495, at *5

7    (S.D.N.Y. Aug. 4, 2015) (because the Exchange Act provides for nationwide service of process,

8    and Defendant resides within the United States, and conducts business within the United States,

9    he or she should reasonably anticipate being haled into court in the United States, and Court's

10   exercise of personal jurisdiction over Defendant with respect to Plaintiffs' securities fraud claim

11   is proper); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262 NRB, 2015

12   WL 6243526, at *23 (S.D.N.Y. Oct. 20, 2015) ("[w]hen the jurisdictional issue flows from a

13   federal statutory grant that authorizes suit under federal-question jurisdiction and nationwide

14   service of process . . . Second Circuit has consistently held that the minimum-contacts test in such

15   circumstances looks to contacts with the entire United States rather than with the forum state.").

16       10.    Venue is proper under 28 U.S.C. § 1391(b) because Defendants transact business

17   in this District. In particular, Chembio is incorporated in this District and the Merger will be

18   affected in this District in accordance with Nevada Revised Statutes ("NRS") Section 92A.133.

19   Further, as stated in the Tender Offer, Project Merci Merger Sub, Inc. ("Purchaser") is a Nevada

20   corporation, and Chembio's Registered Agent is CT CORPORATION SYSTEM located at 701 S

21   CARSON ST STE 200, Carson City, NV, 89701, USA, although certain questions of record exist

22   about this Registered Agent, as noted in Plaintiff's "Memorandum of Points and Authorities in

23   Opposition to Motion for a Summary Judgment" on Dec 12, 2023.

## PARTIES

11.   Plaintiff has been a continuous stockholder of Chembio stock since May 2021.

12.   Defendant Chembio is a Nevada corporation with its principle executive offices located at 3661 Horseblock Road, Medford, New York 11763.

13.   Defendant Katherine L. Davis has been Chair of the Board and served as a director of the Company at all relevant times.

14.   Defendant John G. Potthoff, Ph.D., has served as a director of the Company at all relevant times.

15.   Defendant David W.K. Acheson, M.D., has served as a director of the Company at all relevant times.

16.   Defendant David W. Bespalko has served as a director of the Company at all relevant times.

17.   Defendant Richard L. Eberly currently serves as the President and Chief Executive Officer ("CEO") of the Company, and has served as a director of the Company at all relevant times.

18.   Defendant Leslie Teso-Lichtman has served as a director of the Company at some relevant times.

19. Defendant Lawrence J. Steenvoorden served as the Company's Chief Financial Officer at some relevant times. Defendant Steenvoorden personally signed the Recommendation Statement.

20.   Defendants identified in paragraphs 13 to 19 are collectively referred to herein as the "Individual Defendants," and together with Chembio, collectively, the "Defendants."

# **DIFFICULTIES IN SERVING THE SUMMONS**

1   21. Plaintiff acknowledges he had difficulties properly serving the summons for his original

2   Complaint pursuant to Fed. R. Civ. P. 4, despite sending multiple properly constructed packages

3   to Chembio's principle executive offices listed at 3661 Horseblock Road Medford, NY 11763 via

4   Registered Mail and receiving return receipts as submitted to the court. Defendant Eberly's listed

5   address in the Recommendation Statement is also this same executive offices address as seen on

6   the SCHEDULE 14D-9 Tender Offer Solicitation/Recommendation Statement on the SEC's

7   website (listed as the "Name, address and telephone number of person authorized to receive notices

8   and communications on behalf of the person filing statement") and could be assumed to be a

9   reasonable address for the other Board Members. Plaintiff also sent "InMail" on LinkedIn to all

10  seven Individual Defendants on June 23, 2024 with PDF file copies of this Amended Complaint

11  and summons. However, a previous motion to serve Defendants by social media was denied.

12  Plaintiff acknowledges that both the Court and the Defendants do not deem any of this proper

13  service of the summons pursuant to Fed. R. Civ. P. 4 and seeks to remedy this promptly.

14  22. Since Plaintiff was previously granted a motion to proceed in forma pauperis for the

15  original Complaint and since Plaintiff's financial situation has only deteriorated since then,

16  Plaintiff will file, along with this Amended Complaint, an additional motion to proceed in forma

17  pauperis. Plaintiff assumes this motion will be approved by the Court for the same reasoning that

18  the original motion was approved.

19  23. Fed. R. Civ. P. 4. (c) explains that service of the summons can be achieved by a Marshal

20  or Someone Specially Appointed by the Court. Plaintiff formally requests that the Court order that

21  service of the summons be made by a United States marshal or deputy marshal or by a person

1    specially appointed by the Court. Fed. R. Civ. P. 4. (c) also explains that since the Plaintiff is

2    authorized to proceed in forma pauperis under 28 U.S.C. §1915, that the Court must so order

3    service by U.S. Marshal or other means. Plaintiff is certain that C T Corporation System is the

4    proper agent to receive service of process for Defendant Chembio Diagnostics, Inc.: C T

5    Corporation System, 701 S Carson St., STE 200, Carson City, NV 89701. Plaintiff is providing a

6    series of additional business addresses related to some of the Individual Defendants in his

7    "MOTION FOR SERVICE BY U.S. MARSHAL OR OTHER MEANS." As stated in the motion,

8    Plaintiff has conducted a diligent inquiry in an attempt to ascertain the other Individual Defendants'

9    current places of abode. After the diligent inquiry, Plaintiff has been unable to locate Defendants'

10   current residences and can only provide some of their business addresses listed in that motion for

11   service of summons. In the alternative, if service at the aforementioned addresses is unsuccessful,

12   Plaintiff provides certain details about Defendants to aid the USMS or any other Court appointed

13   person in an attempt to skip trace the locations where Defendant(s) may be likely found.

14          24. Pursuant to Fed. R. Civ. P. 4. (d) Plaintiff is also sending to known Defendants'

15   business addresses a "Notice of Lawsuit and Request to Waive Service of Summons" via

16   Registered Mail along with copies of the Amended Complaint and summons, to the business

17   addresses listed in the "MOTION FOR SERVICE BY U.S. MARSHAL OR OTHER MEANS."

18   This action is detailed in Plaintiff's "MOTION TO WAIVE SERVICE OF SUMMONS." Plaintiff

19   believes that waiving service is an appropriate alternative means of service in this case, as

20   Defendants' Attorneys have not been forthcoming with Defendants' places of abode in any of their

21   filings in the Docket up until this point and it would create unreasonable financial burden for

22   Plaintiff to hire a process server or to use some other means to obtain these addresses. Pursuant to

23   Fed. Civ. P. 4., Plaintiff will send properly constructed packages containing the Amended

1    Complaint, Summons, and Request to Waive Service of Summons to Chembio's Registered Agent,

2    C T Corporation System (which should be proper, regardless) and known business addresses for

3    some of the Individual Defendants via USPS Registered Mail and report back to the Court all

4    receipts of delivery. Plaintiff anticipates that it will be most likely that he is able to achieve proper

5    service of summons pursuant to Fed. R. Civ. P. 4 for Chembio Diagnostics, Inc. via their

6    Registered Agent C T Corporation System, but that achieving proper service of summons for the

7    Individual Defendants could be considerably more difficult due to the aforementioned reasons.

## COMPANY BACKGROUND

8        25. Based on Chembio's January 2023 Corporate Presentation / Investor Deck in the Investor

9    Relations section of Chembio's website (https://chembio.com/): Chembio develops and

10   commercializes high-quality point-of-care and OTC diagnostic tests for the rapid detection and

11   diagnosis of infectious diseases that provide results in approximately 15 minutes using fingertip

12   blood, nasal swabs, and other sample types. Chembio has 3 Core Product Technologies: 1) DPP

13   (Dual-Path Platform) Point-of-Care, 2) SURE CHECK Self-Test OTC (OTC launches in Europe,

14   UK & Brazil and pursuing U.S. OTC, $635 Million HIV point-of-care market cited by Chembio /

15   Insight Partners, The SURE CHECK Self-Test OTC product is in over 40,000 international

16   pharmacies.), and 3) STAT-PAK Point-of Care (HIV, Chagas). Chembio has 211 employees

17   worldwide, 23 issued U.S. patents, some number of pending U.S. patents, and 80+ distribution

18   partners. Pre-2020, the Company's broad portfolio of infectious disease products was focused

19   principally on sexually transmitted disease and fever & tropical disease in high volume and low

20   margin markets. From 2020-2021, the Company shifted "substantially all" resources to leverage

21   the DPP technology platform to address the acute & escalating need for diagnostic testing for

1    COVID-19. From 2022 and on, the Company cites an "exciting future" framed around extracting

2    value from DPP technology for anticipated higher-value point-of-care assays in developed

3    markets.

4

5    In the USA, Chembio has products labeled:  **1)** DPP SARS-CoV-2 Ag (FDA EUA pending), **2)**

6    DPP HIV-Syphilis System (CLIA Waiver pending at date of the Tender Offer, now CLIA

7    approved), **3)** DPP HIV 1/2, **4)** SURE CHECK HIV 1/2 Self-Test (US in development, but past

8    feasibility status), **5)** HIV 1/2 STAT-PAK, **6)** DPP Zika IgM, **7)** DPP Ebola Antigen (EUA), **8)**

9    DPP Cervid TB, and **9)** DPP Elephant TB.

10

11    In Latin America (labeled LATAM), Chembio has products labeled: **1)** DPP SARS-CoV-2

12    Antigen (approved by ANVISA, CE mark, SAPHRA), **2)** DPP SARVS-CoV-2 Ag Self-Test

13    (pending approval by ANVISA, CE Mark), **3)** DPP COVID-19 IgM/IgG System (approved by CE

14    Mark), **4)** DPP Respiratory Antigen Panel (approved by CE Mark, ANVISA), **5)** DPP HIV-1/2

15    Assay, **6)** SURE CHECK HIV 1/2 Assay, **7)** HIV 1/2 STAT-PAK Assay, **8)** SURE CHECK HIV

16    Self-Test (approved by WHO, CE, ANVISA, UK Southeast Asia), **9)** Chagas STAT-PAK, **10)**

17    DPP HIV-Syphilis System, **11)** DPP Syphilis Screen & Confirm Assay, **12)** DPP Zika IgM/IgG

18    System, **13)** DPP ZCD IgM/IgG System, **14)** DPP Dengue NS1 Antigen System, **15)** DPP Dengue

19    IgM/IgG System, **16)** DPP Chikungunya System, **17)** DPP Leishmaniasis Assay, **18)** DPP

20    Confirmatory Assay, and **19)** DPP Microreader.

21

22    In Europe, the Middle East, and Asia (labeled EMEA & Asia) Chembio has products labeled: **1)**

23    DPP SARS-CoV-2 Antigen, **2)** DPP SARS-COV-2 IgM/IgG, **3)** DPP Respiratory Antigen Panel,

1    **4)** STAT-VIEW HIV 1/2 Assay, **5)** SURE CHECK HIV 1/2 Assay, **6)** HIV 1/2 STAT-PAK Assay,

2    **7)** SURE CHECK HIV Self-Test, **8)** DPP HIV 1 Assay, DPP HIV-Syphilis, **9)** DPP Syphilis

3    Screen & Confirm Assay, **10)** DPP Zika IgM/IgG System, **11)** DPP ZCD IgM/IgG System, **12)**

4    DPP Dengue Combo, **13)** Chagas STAT-PAK Assay, **14)** DPP Microreader, and **15)** DPP

5    Microreader II.

6

7    Not related to any specific region, Chembio has products labeled: **1)** DPP Syphilis TnT (Feasibility

8    underway) and **2)** DPP Lyme IgM/IgG (Feasibility underway).

9

10   Additionally, Chembio has a business relationship with InBios for a branded "STATUS" COVID-

11   19 diagnostic antigen respiratory panel that is not listed in the Investor Deck, as well as technology

12   and potential revenue sharing agreements with AstraZeneca, Takeda Pharmaceuticals, and

13   LumiraDX mentioned in conference calls.


## Background to the Merger with Biosynex


14          26.     On April 22, 2022, at a meeting of the Board, one of the Company's financial

15   advisors, Craig-Hallum Capital Group LLC ("Craig-Hallum"), recommended the Company

16   pursue a strategic sales process in light of ongoing regulatory, operational and liquidity

17   challenges. Craig- Hallum reviewed a list of potential acquirers. After hearing Craig-Hallum's

18   recommendations, the Board decided to retain Craig-Hallum to pursue a potential sale or other

19   strategic transaction (which the Board referred to as "Project Cheetah").

27.     During May 2022, Craig-Hallum engaged in "broad outreach" to potential strategic partners for the Company that Craig-Hallum viewed as most likely to be interested in and able to engage in a possible strategic transaction with Chembio. However, public stockholders knew virtually nothing about the nature of this outreach or what information was or was not disclosed to the interested parties. Defendant Eberly solicited input from and provided the members of the Board and the Business Strategy Committee of the Board (the "Strategic Committee") with periodic updates regarding Project Cheetah throughout the process. Following Craig-Hallum's initial outreach, the Company entered into confidentiality and non- disclosure agreements ("NDAs") with three potential acquirers on May 25, 2022, including Biosynex.

28.     During the week of June 27, 2022, members of the Company's management met with Biosynex to discuss the operational benefits associated with a potential transaction, however no details about what operations specifically were most material were provided to Chembio Stockholders in the next quarterly update.

29.     On July 19, 2022, Craig-Hallum informed the Strategic Committee that Biosynex was not interested in pursuing an acquisition of the Company at the time, but was preliminarily considering a potential purchase of or investment in the Company's wholly-owned German subsidiary, and a license agreement for the Company's DPP technology. Material information about the financial breakdown of Chembio's German subsidiary vs other Chembio subsidiaries (Brazil, Malaysia) and its U.S. business as well as its financial breakdown of DPP technology vs. its other technologies were never shared with Chembio Stockholders. Chembio stock surged to approximately $1.10 per share not long thereafter in the beginning of August 2022, more than the $0.45 per share eventually arrived upon in January 2023.

1    30.    On November 8, 2022, the Company and so-called Party A entered into a non-
2    binding term sheet for the acquisition of the Company by Party A (the "Party A Non-Binding Term
3    Sheet") in a one step merger transaction. The Party A Non-Binding Term Sheet contemplated the
4    acquisition of all of the outstanding shares of the Company for an initial price of $0.42 per share
5    to be reduced by certain sums. The Company preliminarily estimated that the Company's
6    stockholders would potentially receive between $0.20 and $0.30 per share in connection with such
7    transaction depending upon the timing of closing and the actual amount of the reductions. The
8    Party A Non- Binding Term Sheet also included a 30-day exclusivity period.

9    31.    During the week of November 28, 2022, however, Party A advised the Company
10   that it no longer wished to pursue a one-step merger transaction as originally contemplated, and
11   demanded interim commercial arrangements in advance of any potential transaction.

12   32.    On December 8, 2022, following the expiration of the Company's exclusivity with
13   Party A, the Company's senior management contacted Biosynex to discuss a potential strategic
14   transaction.

15   33.    On December 15, 2022, following further discussion between the parties, Biosynex
16   sent the Company a non-binding term sheet providing for the acquisition of the Company for
17   between $0.40 and $0.45 per share in cash.

18   34.    On December 15, 2022, the Company advised Party A that Company A was not
19   interested in proceeding with any sort of interim commercial arrangements followed by a potential
20   acquisition of the Company, but that it would be interested in a possible sale transaction at $0.42
21   per share with no adjustments. Party A never responded to such proposal.

1     35.    On December 16, 2022, the Company executed the non-binding term sheet with

2    Biosynex providing for the acquisition of the Company for between $0.40 and $0.45 per share in

3    cash through a tender offer for a majority of the outstanding shares followed by a short-form

4    merger under Nevada law. The term sheet contained an exclusivity period until January 31, 2023.

5     36.    On January 27, 2023, after further discussions between the Company and Biosynex,

6    and due diligence by Biosynex, the Company and Biosynex agreed to a price of $0.45 per share in

7    cash.

8     37.    On January 31, 2023, Craig-Hallum provided its opinion ("Fairness Opinion") to

9    the Board that the Merger Consideration was fair from a financial point of view to Chembio

10    Stockholders. The Board thereafter unanimously determined that the Merger and related

11    transactions were in the best interests of the Company and its stockholders, and resolved to

12    recommend that Chembio Stockholders tender their Shares to Biosynex pursuant to the Tender

13    Offer.

14     38.    On January 31, 2023, the Company and Biosynex issued a joint press release

15    announcing the transaction.

16

17                     **Substantive Allegations**

18    39. The Tender Offer fails to break out the financial performance and projections of key

19    individual products that materially impacts the overall value of Chembio. Chembio and the Board

20    must avoid selective disclosure in the Tender Offer. If Defendants have already shared detailed

21    financials with the bidding company, they cannot withhold that information from investors in the

22    Tender Offer. Breaking out revenue obtained to date and revenue projections for the future for

1    each product is necessary, otherwise there is a material omission of information. As listed above

2    under "Company Background," Chembio has a significant number of individual products in

3    different markets. Not even product segments or regions/subsidiaries were broken out in the

4    Tender Offer. It would not be unduly burdensome or reveal confidential information to provide

5    detailed financials for all of Chembio's key products. Defendants could have highlighted the

6    performance of the most critical products, while providing more general financials for the

7    remaining ones. If specific projections are difficult, offering ranges for current and future revenue

8    for each segment/subsidiary would be necessary. The goal would be to provide investors with

9    enough information to understand Chembio's business and assess the fairness of the Tender Offer

10   price. Plaintiff submitted in his "Memorandum of Points and Authorities in Opposition to Motion

11   for a Summary Judgement" an example CDC invoice record of a Chembio Influenza DPP

12   prototype assays order for a total of $50,000 ordered on August 20, 2008 that, when aggregated,

13   would be the sort of product/product segment and region/subsidiary breakdown alluded to which

14   was omitted.

15        40. The Tender Offer fails to break out the financial performance and projections of key

16   financial partnerships Chembio had with Takeda Pharmaceuticals, AstraZeneca, LumiraDX, and

17   80+ distribution partners. Revenue-sharing terms are material and need disclosure in the Tender

18   Offer. Similar to the above Substantive Allegation, these partnerships could generate a substantial

19   portion of Chembio's revenue, so details about these agreements are material and need to be

20   disclosed. Because these are strategic alliances that are critical for Chembio's technology

21   development and market access, some disclosure about the partnership's structure and purpose is

22   necessary. Joint research and development details Chembio had with these companies was not

23   overviewed in the Tender Offer, either.

1       41. The Tender Offer misleads investors by failing to explain why a Fairness Opinion from

2  a different investment bank (rather than Craig-Hallum) was not sought that did not have a conflict

3  of interest with Defendants. That is, an investment bank with no prior involvement or trading

4  activity related to Chembio. This would ensure a more objective assessment. The Board has a

5  fiduciary duty to act in the best interests of shareholders. Choosing an investment bank with a

6  conflict of interest for the Fairness Opinion is a breach of that duty. As stated in the Tender Offer,

7  Craig-Hallum provided investment banking services to Chembio in the past, including an up to

8  $60,000,000 dilutive shelf stock offering dated July 19, 2021 of which Craig-Hallum was entitled

9  to up to 3.5% ($2.1 million). Craig-Hallum received at least $1,653,083 in compensation from the

10  Company for investment banking services as per the Tender Offer, and an advisory fee of

11  $1,000,000 in addition to the fee to be paid in connection with the rending of the Fairness Opinion.

12  In addition, Craig-Hallum stated in the Fairness Opinion that Craig-Hallum and their affiliates may

13  have actively traded securities of Chembio for their own account or the account of their customers,

14  and, accordingly, may at any time have held a long or short position in such securities. If such

15  short positions were taken by Craig-Hallum or its affiliates, this could be considered a significant

16  material conflict of interest, due to information asymmetry between Craig-Hallum and the Board

17  versus what was known by Chembio Stockholders.

18       42. The Tender Offer omits any definitive statement of record regarding underlying cause(s)

19  of hundreds of thousands if not low millions of aggregate Chembio shares that "failed-to-deliver"

20  on dozens of days during the relevant time period, as well as other publicly traded companies like

21  Lucira Health that had aggregate shares failing-to-deliver that the Craig-Hallum Fairness Opinion

22  used to compare to Chembio for similarity purposes. Craig-Hallum fails to decisively state in the

23  Tender Offer if they or any of their affiliates had anything to do with these "fails to deliver," or if

1   they had any other insight into the cause of these market distortions. Plaintiff pleads that if the

2   Board/Craig-Hallum simply pointed investors to the SEC's "fails-to-deliver" website and stated

3   that they knew nothing about the underlying cause of these failures would have satisfied the cause

4   for concern over this material omission. What "failed-to-deliver" means is that many trade

5   settlements did not go smoothly during the relevant time period. Someone involved in the trade

6   did not fulfill their obligations, i.e. the buyer did not have the money to pay for the shares at

7   settlement, or the seller did not actually own (or could not locate) the shares they sold, and so could

8   not transfer them to the buyer. Plaintiff inquired about the specific nature of Chembio's shares (and

9   Lucira) failing to deliver on dozens of days over the relevant time period with the SEC via the

10   Freedom of Information Act (FOIA) process. However, the SEC (utilizing a third-party contractor,

11   not a SEC employee) withheld details in their FOIA response citing "5 U.S.C. § 552(b)(4).

12   Exemption 4 of the FOIA protects "trade secrets and commercial or financial information obtained

13   from a person [that is] privileged or confidential." However, Plaintiff can find no public record of

14   a definitive court challenge regarding the SEC's specific use of 5 U.S.C. § 552(b)(4) to exempt

15   failed-to-deliver data from FOIA requests. Plaintiffs argues that the public interest in market

16   transparency outweighs the confidentiality concerns, especially if the data is anonymized. That

17   data itself is not, in Plaintiff's view, truly confidential, considering it only reflects aggregate

18   numbers of undelivered shares. Plaintiff asks the Court to consider this opaque market process and

19   how it could have affected comparisons in the Craig-Hallum Fairness Opinion, including the lack

20   of any legal challenge, in evaluating whether the Board and the Craig-Hallum Fairness Opinion

21   omitted material information by even acknowledging the issue.

22       43. Since Chembio's material regulatory issues with the FDA are so significant that multiple

23   key product launches were deeply affected and its material research & development grant timelines

1    with the CDC were impacted multiple times, as stated in multiple conference calls, the Tender

2    Offer omits fair resolution of these issues. This casts doubt on the timing of who gets to capitalize

3    on any financial growth from Chembio products or product variations in the pipeline (as Defendant

4    Eberly called it "tremendous growth," in a conference call on Nov 6, 2022). The Tender Offer

5    should have contained this information so investors could assess Chembio's business. Existing

6    shareholders at the time of the Tender Offer who did not wish to tender their shares surely wanted

7    to capitalize on these products in the pipeline that were stalled from a regulatory perspective,

8    especially if only relatively minor or cheap clinical trials, minor product tweaks, etc. were needed

9    to get the product through the stalled regulatory process. These regulatory issues are material and

10   need to be addressed in detail in the Tender Offer, but these details were omitted.  This is why

11   Plaintiff filed various FOIA requests with Chembio's regulator, the FDA, and Chembio's source

12   of grant monies the CDC. This is also why Plaintiff claims Chembio and the Board should have

13   filed FOIA requests on their products themselves, in his "Memorandum of Points and Authorities

14   in Opposition to Motion for a Summary Judgment," to provide more detail to Chembio's regulatory

15   issues, and how truly minor or major the stalled regulatory process was, such that cost estimates

16   to fix the stall could be estimated by investors. Only Chembio and the Board completely knew the

17   relevant FDA CBER (Center for Biologics Evaluation and Research) product titles, numbers, or

18   application files and relevant FDA CBER custodians / e-mail inboxes that worked with Chembio.

19   Only with this metadata could detailed regulatory information be gleaned by investors to value

20   Chembio through any type of inquiry with the FDA, including FOIA. The same type of regulatory

21   metadata crucial for any type of serious regulatory inquiry goes for the CDC that only Chembio

22   could know. The Tender Offer needed to provide more specific descriptions as to the resolution of

23   these regulatory issues, including potentially the aforementioned metadata, rather than catch-all

1    statements employed by Defendants in the Tender Offer that attempt to absolve themselves of

2    answering any such regulatory questions, such that investors could assess Chembio's business.

3        44.    Craig-Hallum's Analysis of Comparable Publicly Traded Companies in The Tender

4    Offer is misleading. The Recommendation Statement states ("the Company" being Chembio):

5        "Craig-Hallum reviewed and compared certain publicly available financial data, ratios and

6    trading multiples for six comparable publicly traded companies that Craig-Hallum determined,

7    based on its professional judgment, to be reasonably comparable to the Company. The comparable

8    publicly traded companies Craig- Hallum selected were Biosynex SA, Co-Diagnostics, Inc., Lucira

9    Health, Inc. ("Lucira"), Lumos Diagnostics Holdings Limited, OraSure Technologies, Inc., and

10   Trinity Biotech plc. Although none of the six selected publicly traded companies are directly

11   comparable to the Company, Craig-Hallum reviewed these companies because, among other

12   things, Craig-Hallum determined that their businesses, financial information, service offerings,

13   and operating profiles are reasonably comparable to those of the Company for purposes of this

14   analysis. In selecting comparable public companies, Craig-Hallum focused on healthcare

15   diagnostic companies focused on infectious diseases with enterprise values below $500 million."

16

17   Plaintiff would like the Court to consider some background information about one of the compared

18   companies, Lucira Health, to provide some detail to just how misleading these company

19   comparisons to Chembio made by Craig-Hallum were: On February 22, 2023 one of the companies

20   Craig-Hallum compared Chembio Diagnostics to for the purposes of the Fairness Opinion, Lucira

21   Health, filed for Chapter 11 bankruptcy despite being seemingly financially solvent publicly, with

22   a cited reason of, similarly to Chembio, a "protracted" FDA regulatory review process for at least

23   one of its COVID-19/flu products. The protracted regulatory review process caused a predatory

1    loan by Silicon Valley Bank (which collapsed and was seized by the California Department of

2    Financial Protection and Innovation on March 10, 2023) to hit approximately 50% interest, the

3    terms of which were only disclosed publicly in the Delaware bankruptcy court after Chapter 11

4    bankruptcy was declared, thus making the public aware of why Lucira's otherwise healthy public

5    balance sheet, was, in fact, toxic. Lucira Health curiously received FDA Authorization of the "First

6    & Only At-Home Combination PCR COVID-19 & Flu Test", two days after it declared

7    bankruptcy, on February 24, 2023. Lucira's intellectual property was purchased by Pfizer in the

8    Chapter 11 process in Delaware bankruptcy court for around $10 million, and Pfizer used Lucira's

9    debts for net operating loss purposes. Lucira's Intellectual Property is now called "LUCIRA® by

10   Pfizer for COVID-19 & Flu At Home Test" and is being used to grow Pfizer's vaccine business.

11   Plaintiff was a shareholder of Lucira and lost between $4,000 and $6,000 in this bankruptcy, as he

12   never sold his shares.  Now, Plaintiff describes why this type of comparative analysis that the

13   Fairness Opinion revolves around is misleading on a company-by-company basis, subject to his

14   own research:

15          i) First, since the Lucira bankruptcy occurred prior to the voting period for the Tender Offer,

16   an amendment should have been made to the Tender Offer removing Lucira from the comparisons,

17   due to their Chapter 11 bankruptcy process and involvement in predatory loans to achieve funding.

18   Further, Lucira Health is not a comparable company either, because they are engaged only in PCR

19   technology, unlike Chembio which is only engaged in antibody and antigen testing. This involves

20   completely different automation processes to create the tests. Lucira was using a third-party

21   contractor, Jabil, to manufacture its PCR tests, while Chembio was using in-house manufacturing

22   processes, both manual and automated, and trying to move toward as much automation as possible.

23   Also, Lucira was a COVID-19/flu-specific company and did not have a diversified portfolio of

1   "infectious disease" products, technology and revenue sharing agreements, and intellectual

2   property and patents as Chembio does. There are material reasons to believe that comparing

3   Chembio to Lucira is misleading because Chembio has a significantly different and diversified

4   product mix and partners, there are major differences in their manufacturing arrangements, and

5   Chembio's utilized dilutive stock offerings to obtain funding while Lucira used predatory loans.

6       ii) Comparing OraSure Technologies to Chembio is also misleading because OraSure

7   received a massive grant from the Department of Defense (DoD), almost 12 times larger in revenue

8   than the supposed Tender Offer valuation for Chembio. Chembio was targeting the OTC US

9   market, the same as OraSure, with similar antigen technology. DoD awarded a $205.2 million

10  contract to OraSure Technologies, Inc., to purchase OTC COVID-19 test kits during some of the

11  relevant time period. Deliveries of the 20.6 million test kits commenced October 2021 and the

12  ordering capability continued until September 2022. See: DoD Awards $647 Million in Contracts

13  for            Over-the-Counter            COVID-19            Test            Kits

14  (https://www.defense.gov/News/Releases/Release/Article/2780251/dod-awards-647-million-in-

15  contracts-for-over-the-counter-covid-19-test-kits/). If anything, Craig-Hallum's inclusion of

16  OraSure Technologies shows that Chembio is potentially worth much more than the $17.2 million

17  market capitalization ascertained in the Tender Offer, if the stalls in their regulatory issues can be

18  resolved, and if their manufacturing processes can be automated, as stated in conference calls.

19  Additional information is omitted in the Tender Offer to reconcile why this massive disparity in

20  revenue sources in the Fairness Opinion is not misleading.

21      iii) Co-Diagnostics, Inc. is not a comparable company either, because similarly to Lucira,

22  they are engaged in PCR technology, again unlike Chembio which is only engaged in antibody

23  and antigen testing.

1    iv) Biosynex SA, Co-Diagnostics, Inc. is not a comparable company, because it does not

2    have a U.S. listed stock and is illiquid with less than 10,000 shares occasionally trading daily on

3    the French ALBIO exchange. Furthermore, due to potential conflicts of interest with the Merger

4    (they are the acquiring company, after all), this analysis should be excluded by Craig-Hallum.

5    45. For the Fairness Opinion to say that the companies chosen to compare Chembio to had

6    "enterprise values below $500 million" does not agree with other statements filed with the SEC

7    by Chembio that companies in the biologics domain have stock prices are often "volatile" due to

8    their reliance on regulatory approvals and grant monies. Since the calculation for Enterprise Value

9    depends on the Market Capitalization, which in turn depends on stock price, the underlying

10   volatility in Chembio's stock price or any of the compared company's stock prices has a huge

11   impact on these comparisons made by Craig-Hallum, and they are materially misleading. The

12   formula is: Market Cap (which is Current Share Price x Number of Outstanding Shares) + Debt –

13   (Cash and Cash Equivalents) = Enterprise Value.

14   46.    A financial advisor's fairness opinion, such as Craig-Hallum's herein, is one of the

15   most important process-based underpinnings of a board's recommendation of a transaction to its

16   stockholders. In particular, when a financial advisor's endorsement of the fairness of a transaction

17   is touted to stockholders, not just the analyses used by that advisor to arrive at the fairness opinion,

18   but also the key inputs and assumptions used in those analyses must be fairly disclosed.

19   47.    Here, the Fairness Opinion of Craig-Hallum improperly failed to disclose certain

20   key inputs and assumptions underlying the analyses on which it was based, which renders it

21   misleading. Without this information, as described, Chembio Stockholders are unable to fully

22   understand Craig-Hallum's analyses and, thus, are unable to determine what weight to place on

23   the Fairness Opinion in deciding whether or not to tender their shares. This omitted information,

1    if disclosed, could significantly improve Chembio's prospects of receiving a higher valuation than

2    $0.45 per share in the public markets.

3         48. For the reasons stated in this Substantive Allegations section, Defendants disseminated

4    a false and misleading Recommendation Statement to Chembio Stockholders that misrepresents

5    or omits material information that is necessary for Chembio Stockholders to make an informed

6    decision concerning whether to tender their shares to Biosynex pursuant to the Tender Offer.

## CLAIMS FOR RELIEF

### COUNT I

*Against All Defendants for Violations of Section 14(e) of the Exchange Act*
*(17 CFR § 240.14e-2)*

7         49.          Plaintiff incorporates and repeats each and every allegation above as if fully

8    set forth herein.

9         50.          Defendants disseminated the Recommendation Statement to Chembio

10   Stockholders recommending that Chembio Stockholders tender their shares to Biosynex in

11   connection with the Tender Offer.

12        51.          By virtue of their positions within Chembio, and/or roles in the process of

13   preparing, reviewing, and/or disseminating the Recommendation Statement, Defendants were

14   aware of their duty not to make false and misleading statements in the Recommendation Statement,

25

1    and not to omit material facts from the Recommendation Statement necessary to make statements

2    made therein— in light of the circumstances under which they were made—not misleading.

3        52.        Yet, as specified above, in violation of Section 14(e) of the Exchange Act,

4    Defendants knowingly or recklessly (i) made untrue statements of material fact in the

5    Recommendation Statement, and (ii) omitted material facts from the Recommendation Statement

6    necessary to make statements therein—in light of the circumstances under which they were

7    made—not misleading, in order to induce Chembio Stockholders to tender their shares in the

8    Tender Offer, and thereby maximize their own personal gain by (i) converting their Chembio

9    shares into cash through the immediate sale of all of their Chembio shares for cash, (ii) the

10    immediate conversion of their Chembio equity-based awards into cash, and (iii) the potential

11    receipt of "Change in Control" payments and other employment agreements (as detailed in the

12    sections of the Recommendation Statement entitled "Arrangements with Current Executive

13    Officers and Directors of the Company" and "Potential Change in Control Payments to Named

14    Executive Officers"). The potential for personal gain includes the potential for doubled lump sum

15    payments upon termination ("double trigger"), accelerated vesting, and target bonus payouts. It

16    should be noted that it appears that none of the Board members ever worked for Biosynex in any

17    capacity after the merger was consummated via LinkedIn records, thus the realistic potential for

18    some of these "Change in Control"-type payments and agreements to have kicked in.

19        53.        The material misrepresentations and omissions in the Recommendation

20    Statement specified above in Substantive Allegations are material insofar as there is a substantial

21    likelihood that a reasonable Chembio Stockholder would consider them important in deciding

22    whether to tender their shares. In addition, a reasonable Chembio Stockholder would view

1   disclosures of the material omitted facts specified above as significantly altering "the total mix" of

2   information made available to Chembio Stockholders.

3       54. Due to all the regulatory issues with the FDA and CDC mentioned herein, the

4   Defendants could have opted to a) express no opinion and remained neutral toward the Biosynex

5   Tender Offer / Craig-Hallum Fairness Opinion; or b) said they were unable to take a position with

6   respect to the Biosynex Tender Offer / Craig-Hallum Fairness Opinion.

## COUNT II

### *Against All Defendants for Violations of Section 14(d) of the Exchange Act*

### *(17 CFR § 240.14d-101)*

7       55.       Plaintiff incorporates and repeats each and every allegation above as if fully

8   set forth herein.

9       56.       As set forth above, Defendants knowingly or recklessly omitted material

10  facts from the Recommendation Statement necessary to make statements therein—in light of the

11  circumstances under which they were made—not misleading, in order to induce Chembio

12  Stockholders to tender their shares in the Tender Offer. Accordingly, Defendants have violated

13  Section 14(d)(4) of the Exchange Act and 17 CFR § 240.14d-101.

## COUNT III

### *Against All Defendants for Violations of Regulation M-A of the Exchange Act*

### *(17 CFR § 229.1011(c))*

57.     Plaintiff incorporates and repeats each and every allegation above as if fully set forth herein.

58.         As set forth above, Defendants did not furnish additional material information in the Recommendation Statement to make the required statements not materially misleading. This was done to induce Chembio Stockholders to tender their shares in the Tender Offer. Accordingly, Defendants have violated Regulation M-A of the Exchange Act and 17 CFR § 229.1011(c).

## COUNT IV

### *Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act*

59.         Plaintiff incorporates and repeats each and every allegation above as if fully set forth herein.

60.         The Individual Defendants acted as controlling persons of Chembio within the meaning of Section 20(a) of the Exchange Act, as alleged herein. By virtue of their positions as officers and/or directors of Chembio, and participation in, and/or awareness of Chembio's operations, and/or intimate knowledge of the contents of the Recommendation Statement filed with the SEC, they had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Chembio with respect to the Recommendation Statement, including the content and dissemination of the various statements in the Recommendation Statement that Plaintiff contends are materially false and misleading, and the omission of material facts specified above.

1       61.       Each of the Individual Defendants was provided with or had unlimited

2   access to copies of the Recommendation Statement and other statements alleged by Plaintiff to be

3   misleading prior to and/or shortly after these statements were issued and had the ability to prevent

4   the issuance of the statements or cause the statements to be corrected. In particular, Defendant

5   Steenvoorden personally signed the Recommendation Statement.

6       62.       Each of the Individual Defendants had direct and supervisory involvement

7   in the day-to-day operations of Chembio, and, therefore, is presumed to have had the power to

8   control or influence the particular transactions giving rise to the securities violations alleged

9   herein, and exercised same. In particular, the Recommendation Statement at issue references the

10   unanimous recommendation of the Board to approve the Merger, and recommend that Chembio

11   Stockholders tender their shares pursuant to the Tender Offer. The Individual Defendants were

12   thus directly involved in the making of the Recommendation Statement.

13       63.       In addition, as the Recommendation Statement sets forth at length, and as

14   described herein, the Individual Defendants were involved in negotiating, reviewing, and

15   approving the Merger. The Recommendation Statement purports to describe the various issues and

16   information that the Individual Defendants reviewed and considered in connection with such

17   negotiation, review and approval. The Individual Defendants thus directly participated in the

18   drafting of the Recommendation Statement.

19       64.       By virtue of the foregoing, the Individual Defendants have violated Section

20   20(a) of the Exchange Act.

21       65.       As set forth above, the Individual Defendants had the ability to exercise

22   control over and did control a person or persons who have each violated Section 14(d) and Section

1    14(e), by their acts and omissions as alleged herein. By virtue of their positions as controlling

2    persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and

3    proximate result of Individual Defendants' conduct, Plaintiff is harmed.

## PRAYER FOR RELIEF

4    WHEREFORE, Plaintiff prays for judgment and relief as follows:

5        A.    Granting Plaintiff rescissory damages of the amount lost on Plaintiff's investment.

6    Plaintiff suffered a capital loss of $12,164 as a result of the Tender Offer. Plaintiff purchased

7    12,829 shares and sold 21 shares from 05/25/2021 until 01/19/2023 at prices per share between

8    $0.20 and $3.22. The biggest single date purchase was on 09/28/2021 when Plaintiff bought 5,264

9    shares at $2.59 per share. Plaintiff was "cashed out" on 05/12/2023 for $0.45 per share. Plaintiff's

10   overall "cost basis" was approximately $1.10 to $1.20 per share.

11       B.    Directing Defendant to account to Plaintiff for all damages suffered as a result of

12   their misconduct.

13       C.    Awarding Plaintiff the costs and disbursements of this action, including reasonable

14   fees and expenses; and

15       D.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

16   Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: June 24, 2024

By: /s David S. Gross

David S. Gross

1800 Poplar Dr., Apt #10

Medford, OR 97504

Tel: (951) 240-1620

Email: davidgross18@gmail.com

*Plaintiff*

# United States District Court for the Nevada District

**David Gross** Plaintiff,

v.

**CHEMBIO DIAGNOSTICS, INC., KATHERINE L. DAVIS, JOHN G. POTTHOFF, DAVID W.K. ACHESON, DAVID W. BESPALKO, RICHARD L. EBERLY, LESLIE TESO-LICHTMAN, and LAWRENCE J. STEENVOORDEN.** Defendants.

**Case No.** 3:23-cv-00093-MMD-CSD

## MOTION FOR SERVICE BY U.S. MARSHAL OR OTHER MEANS

1  **COMES NOW,** Plaintiff, David Gross, by and through his/her own pro se appearance, and

2  respectfully moves this Court for an Order directing service of the Summons and Complaint upon

3  Defendants, CHEMBIO DIAGNOSTICS, INC., KATHERINE L. DAVIS, JOHN G. POTTHOFF,

4  DAVID W.K. ACHESON, DAVID W. BESPALKO, RICHARD L. EBERLY, LESLIE TESO-

5  LICHTMAN, and LAWRENCE J. STEENVOORDEN., by the United States Marshals Service or

6  by another person specially appointed by the Court.

7  Plaintiff understands that the US Marshals Service (USMS) generally prioritizes fugitives charged

8  with serious federal crimes or those considered dangerous.  Plaintiff understands that they may not

9  be able to assist with locating individuals wanted for civil matters, such as this one. Plaintiff also

1 understands that the USMS has access to the extensive resources, experience and expertise, and

2 tenacity and persistence to serve the summons in this case.

## Plaintiff's Knowledge of Defendants' Whereabouts

3 Plaintiff is certain that C T Corporation System is the proper agent to receive service of process

4 for Defendant Chembio Diagnostics, Inc.: C T Corporation System, 701 S Carson St., STE 200,

5 Carson City, NV 89701

6 Plaintiff has conducted a diligent inquiry in an attempt to ascertain the other Individual Defendants'

7 current places of abode. After the diligent inquiry, Plaintiff has been unable to locate Defendants'

8 current residences and can only provide the business addresses as gleaned from their respective

9 LinkedIn pages listed below for service of summons:

10 Defendant KATHERINE L. DAVIS: Davis Design Group LLC, 621 E 9th St, Indianapolis, IN

11 46202

12 Defendant DAVID W.K. ACHESON: The Acheson Group, 13983 Ridge Loop Rd, Bigfork, MT

13 59911

14 Defendant LESLIE TESO-LICHTMAN: Atrius Health, P.O. Box 415432, Boston, MA 02241-

15 5432

16 Defendant LAWRENCE J. STEENVOORDEN: FHAS, Inc., 117 West Main Street Plymouth, PA

17 18651

18 Defendant JOHN G. POTTHOFF: Elligo Health Research, 11612 Bee Cave Road, Bldg. 1, Ste.

19 150, Austin, TX 78738 ...AND... RQM+, 2000 Centregreen Way, Suite 200, Cary, NC 27513

2

1    In the alternative, if service at the aforementioned addresses is unsuccessful, Plaintiff knows the

2    following details about Defendants to aid the USMS or any other Court appointed person in an

3    attempt to skip trace the locations where Defendant(s) may be likely found:

4    Defendant RICHARD L. EBERLY: Lists Cincinnati, OH as his place of abode on his LinkedIn

5    page and he does not seem to be currently working, https://www.linkedin.com/in/richard-eberly-

6    4899a7a/

7    Defendant DAVID W. BESPALKO:  Lists Longboat Key, FL as his place of abode on his

8    LinkedIn page and that he currently works for BMC Bespalko Management Consulting in a self-

9    employed capacity, https://www.linkedin.com/in/davidbespalko/

10    Defendant KATHERINE L. DAVIS: Lists Indianapolis, IN as her place of abode on her LinkedIn

11    page and that she is the Owner of Davis Design Group LLC address listed above,

12    https://www.linkedin.com/in/kathydavis/

13    Defendant JOHN G. POTTHOFF: Lists Austin, TX as his place of abode on his LinkedIn page

14    and that he currently works for RQM+ as the CEO and Board Member, Linden-OTPP-Partnership

15    in a remote role as a Platform Partner, and Elligo Health Research as Chairperson of the Board

16    and CEO in a remote role, with addresses of RQM+ and Elligo Health Research listed above,

17    https://www.linkedin.com/in/johnpotthoff/

18    Defendant LAWRENCE J. STEENVOORDEN: Lists the New York City Metropolitan Area as

19    his place of abode on his LinkedIn page and that he currently works at FHAS, Inc. as Chief

20    Financial Officer, with address listed above (Address for FHAS, Inc. found in the HTML of

21    https://www.fhas.com), https://www.linkedin.com/in/larry-steenvoorden-cpa-mba/

3

1   Defendant LESLIE TESO-LICHTMAN: Lists West Tisbury, MA as her place of abode on her

2   LinkedIn page and that she works for Atrius Health Equity Foundation as Board of Directors &

3   Treasurer   in   Boston,   MA   with   PO   Box   address   listed   above,

4   https://www.linkedin.com/in/ltl41980/. She is also known to travel to Europe and potentially has

5   a   US   passport   as   per   this   article   about   Martha's   Vineyard:

6   https://www.mvtimes.com/2018/12/18/karen-medeiros-named-new-town-clerk/

7   Defendant DAVID W.K. ACHESON: Lists Bigfork, MT on his LinkedIn page as his place of

8   abode and that he is the President and CEO of The Acheson Group with address listed above,

9   https://www.linkedin.com/in/david-acheson-m-d-a6773311/

## In Support of this Motion, Plaintiff states:

10   1.   Plaintiff is the Plaintiff in this action and is proceeding in forma pauperis pursuant to 28

11        U.S.C. § 1915.

12   2.   On or around June 24, 2024, Plaintiff filed an Amended Complaint against Defendants,

13        CHEMBIO DIAGNOSTICS, INC., KATHERINE L. DAVIS, JOHN G. POTTHOFF,

14        DAVID W.K. ACHESON, DAVID W. BESPALKO, RICHARD L. EBERLY, LESLIE

15        TESO-LICHTMAN, and LAWRENCE J. STEENVOORDEN., in this Court.

16   3.   Federal Rule of Civil Procedure 4(c)(3) allows a court to order service of a summons and

17        complaint by a United States Marshal or by a person specially appointed by the court when

18        a plaintiff is authorized to proceed in forma pauperis.

19   4.   Plaintiff is unable to afford the cost of private process service.

20

4

1    **WHEREFORE,** Plaintiff respectfully requests that this Court enter an Order directing service

2    of the Summons and Complaint upon Defendants, CHEMBIO DIAGNOSTICS, INC.,

3    KATHERINE L. DAVIS, JOHN G. POTTHOFF, DAVID W.K. ACHESON, DAVID W.

4    BESPALKO, RICHARD L. EBERLY, LESLIE TESO-LICHTMAN, and LAWRENCE J.

5    STEENVOORDEN., by the United States Marshals Service or by another person specially

6    appointed by the Court.

7    **Dated: June 24, 2024**

8    **Respectfully submitted,**

9

10    David Gross

11    **Plaintiff, Pro Se**

12    **1800 Poplar Dr., Apt #10, Medford, OR 97504**

13    **(951) 240-1620**

14    **davidgross18@gmail.com**

# United States District Court for the Nevada District

**David Gross** Plaintiff,

v.

**CHEMBIO DIAGNOSTICS, INC., KATHERINE L. DAVIS, JOHN G. POTTHOFF, DAVID W.K. ACHESON, DAVID W. BESPALKO, RICHARD L. EBERLY, LESLIE TESO-LICHTMAN, and LAWRENCE J. STEENVOORDEN.** Defendants.

**Case No.** 3:23-cv-00093-MMD-CSD

## MOTION TO WAIVE SERVICE OF SUMMONS

1  **COMES NOW,** Plaintiff, David Gross, respectfully moves this Court for an Order permitting
2  Defendants, CHEMBIO DIAGNOSTICS, INC., KATHERINE L. DAVIS, JOHN G. POTTHOFF,
3  DAVID W.K. ACHESON, DAVID W. BESPALKO, RICHARD L. EBERLY, LESLIE TESO-
4  LICHTMAN, and LAWRENCE J. STEENVOORDEN to waive service of the Summons and
5  Complaint in this action.

### In Support of this Motion, Plaintiff states:

6  1.  Plaintiff is the Plaintiff in this action and desires to avoid the unnecessary expense of
7      service of process.

1

2. Defendant(s), CHEMBIO DIAGNOSTICS, INC., KATHERINE L. DAVIS, JOHN G. POTTHOFF, DAVID W.K. ACHESON, DAVID W. BESPALKO, RICHARD L. EBERLY, LESLIE TESO-LICHTMAN, and LAWRENCE J. STEENVOORDEN., is/are located within the United States and subject to the personal jurisdiction of this Court.

3. Federal Rule of Civil Procedure 4(d)(1) permits the Court to order service to be made by such alternative means, "as is most likely to apprise the person of the suit and to afford the person reasonable opportunity to defend."

4. Waiving service is an appropriate alternative means of service in this case as it will ensure Defendants receives the Complaint while saving unnecessary costs.

**WHEREFORE,** Plaintiff respectfully requests that this Court enter an Order:

1. Permitting Defendants, CHEMBIO DIAGNOSTICS, INC., KATHERINE L. DAVIS, JOHN G. POTTHOFF, DAVID W.K. ACHESON, DAVID W. BESPALKO, RICHARD L. EBERLY, LESLIE TESO-LICHTMAN, and LAWRENCE J. STEENVOORDEN. to waive service of the Summons and Complaint in this action.

2. Granting Defendant(s), CHEMBIO DIAGNOSTICS, INC., KATHERINE L. DAVIS, JOHN G. POTTHOFF, DAVID W.K. ACHESON, DAVID W. BESPALKO, RICHARD L. EBERLY, LESLIE TESO-LICHTMAN, and LAWRENCE J. STEENVOORDEN., a period of sixty (60) days from the date of this Court's Order to file a responsive pleading to the Complaint.

**Dated:** June 24, 2024

**Respectfully submitted,**

**David Gross**

Plaintiff

**1800 Poplar Dr., Apt #10, Medford, OR 97504**

**(951) 240-1620**

**davidgross18@gmail.com**

3

EXAMPLE

# Notice of Lawsuit and Request to Waive Service of Summons

IN THE UNITED STATES DISTRICT COURT FOR THE NEVADA DISTRICT

**David Gross** Plaintiff,

v.

**CHEMBIO DIAGNOSTICS, INC., KATHERINE L. DAVIS, JOHN G. POTTHOFF, DAVID W.K. ACHESON, DAVID W. BESPALKO, RICHARD L. EBERLY, LESLIE TESO-LICHTMAN, and LAWRENCE J. STEENVOORDEN.** Defendants.

**Case No.** 3:23-cv-00093-MMD-CSD

**To:** REGISTERED AGENT C T CORPORATION SYSTEM, CHEMBIO DIAGNOSTICS, INC., KATHERINE L. DAVIS, JOHN G. POTTHOFF, DAVID W.K. ACHESON, DAVID W. BESPALKO, RICHARD L. EBERLY, LESLIE TESO-LICHTMAN, and LAWRENCE J. STEENVOORDEN.

1  **A lawsuit has been filed against you in this Court.** A copy of the Complaint is
2  enclosed.

1

1   **You can save the cost of serving you with a Summons.** Federal Rule of Civil

2   Procedure 4(d)(1) allows service to be made by such alternative means as is most

3   likely to apprise you of the suit and to afford you a reasonable opportunity to defend.

4   **I am willing to waive service of the Summons if you agree to do the following:**

5     1.  Sign and return the enclosed Waiver of Service of Summons form within **sixty**

6        **(60) days** from the date this Notice is sent.

7     2.  By returning the signed Waiver, you will agree to receive service of the

8        Complaint and all future documents filed in this case.

9     3.  You will also agree to a deadline of **sixty (60) days** from the date you return

10       the signed Waiver to file a written response to the Complaint with the Court

11       and serve a copy of your response on me.

12  **If you do not return the signed Waiver within sixty (60) days,** I will be forced to

13  have you served with a Summons in the manner provided by law, which will incur

14  additional expense.

15  **Please note:** By signing the Waiver, you do not waive any defenses you may have

16  to the lawsuit.

17  **I encourage you to consult with an attorney** to discuss your rights and obligations

18  in this lawsuit.

2

**Dated:** June 24, 2024

**Sincerely,**

David Gross

**Plaintiff**

**1800 Poplar Dr., Apt #10, Medford, OR, 97504**

**(951) 240-1620**

**davidgross18@gmail.com**

**Enclosures:**

- Copy of Complaint

- Waiver of Service of Summons Form (Two Copies)

- Self-Addressed Stamped Envelope

*EXAMPLE*

AO 399 (01/09) Waiver of the Service of Summons

# UNITED STATES DISTRICT COURT

### for the

District of Nevada

| | |
|---|---|
| David S. Gross | ) |
| *Plaintiff* | ) |
| v. | ) |
| | ) |
| *Defendant* | ) |

Civil Action No. 3:23-cv-00093-MMD-CSD

## WAIVER OF THE SERVICE OF SUMMONS

To:  David S. Gross
        *(Name of the plaintiff's attorney or unrepresented plaintiff)*

      I have received your request to waive service of a summons in this action along with a copy of the complaint, two copies of this waiver form, and a prepaid means of returning one signed copy of the form to you.

      I, or the entity I represent, agree to save the expense of serving a summons and complaint in this case.

      I understand that I, or the entity I represent, will keep all defenses or objections to the lawsuit, the court's jurisdiction, and the venue of the action, but that I waive any objections to the absence of a summons or of service.

      I also understand that I, or the entity I represent, must file and serve an answer or a motion under Rule 12 within 60 days from _____, the date when this request was sent (or 90 days if it was sent outside the United States).  If I fail to do so, a default judgment will be entered against me or the entity I represent.

Date: _____

_____
*Printed name of party waiving service of summons*

_____
*Signature of the attorney or unrepresented party*

_____
*Printed name*

_____
*Address*

_____
*E-mail address*

_____
*Telephone number*

---

### Duty to Avoid Unnecessary Expenses of Serving a Summons

      Rule 4 of the Federal Rules of Civil Procedure requires certain defendants to cooperate in saving unnecessary expenses of serving a summons and complaint.  A defendant who is located in the United States and who fails to return a signed waiver of service requested by a plaintiff located in the United States will be required to pay the expenses of service, unless the defendant shows good cause for the failure.

      "Good cause" does *not* include a belief that the lawsuit is groundless, or that it has been brought in an improper venue, or that the court has no jurisdiction over this matter or over the defendant or the defendant's property.

      If the waiver is signed and returned, you can still make these and all other defenses and objections, but you cannot object to the absence of a summons or of service.

      If you waive service, then you must, within the time specified on the waiver form, serve an answer or a motion under Rule 12 on the plaintiff and file a copy with the court.  By signing and returning the waiver form, you are allowed more time to respond than if a summons had been served.

[ Print ]     [ Save As... ]     [ Reset ]